Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SALEEM ERAKAT

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALEEM ERAKAT, on behalf of himself and all similarly situated persons,<br><br>               Plaintiff,<br><br>v.<br><br>CARVANA OPERATIONS HC LLC, a Delaware limited liability company,<br><br>               Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>1)   Cal. Penal Code § 638.51<br>2)   Cal. Constitution Art. I § 1<br>3)   Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4)   Intrusion Upon Seclusion<br>5)   Unjust Enrichment |

1

Plaintiff SALEEM ERAKAT ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant CARVANA OPERATIONS HC LLC, a Delaware limited liability company ("Defendant" or "Carvana"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.carvana.com (the "Website"), a website that Defendant owns and/or operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To accomplish its data-collection and monetization objectives, Defendant intentionally configured the Website to embed and execute third-party tracking technologies that intercept and disclose the contents of users' electronic communications in real time. As users navigate the Website, these technologies transmit to third parties human-readable communication content embedded directly within request payloads, including users' Internet Protocol ("IP") addresses and full, specific page URLs that reveal the precise vehicle listings, searches, and pages viewed by the user. These payloads disclose not merely abstract identifiers, but readable values that identify *who* is communicating (via explicit IP address tracking) and *what* content the user is accessing (via explicit page URLs and parameters reflecting the subject matter of the visit). The interception and disclosure of this communications content occurs contemporaneously with the user's interaction with the Website, without user consent

and without any court order authorizing such interception, in violation of California Penal Code § 631.

4. In addition to intercepting communications content, Defendant configured the same third-party technologies to operate as unlawful pen registers and trap-and-trace devices or processes by capturing and transmitting non-content dialing, routing, addressing, and signaling information. This information is transmitted in real time within structured request payloads and includes explicit sharing of IP address–based routing information, session and event identifiers, timestamps, referrer headers, device and browser characteristics, and related signaling data that identify the source, destination, and timing of users' communications with the Website. These payload-level transmissions occur automatically upon page load and navigation, before any meaningful opportunity for consent, and are sent to third-party servers for tracking, analytics, and advertising purposes. Defendant did not obtain a court order authorizing the installation or use of any pen register or trap-and-trace device or process and did not obtain users' consent for the capture and transmission of this routing and signaling information, in violation of California Penal Code § 638.51.

5. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

6. When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

7. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics, Tag Manager, DoubleClick)
- Facebook Tracker
- Impact Tracker

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- The Trade Desk Tracker

8. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

9. The Trackers are operated by distinct third parties, including Google LLC (as to the Google Trackers, which include Google Analytics, Google Tag Manager, and Google Ads/DoubleClick), Meta Platforms, Inc. (as to the Facebook Tracker), Impact Tech, Inc. (as to the Impact Tracker), and The Trade Desk, Inc. (as to The Trade Desk Tracker) (collectively, the "Third Parties"). Defendant knowingly enables, deploys, and maintains these Trackers on the Website and thereby aids, employs, agrees with, and conspires with the Third Parties to transmit user data to third-party servers. Through this coordinated configuration, the Trackers identify users and devices and support advertising attribution, behavioral profiling, cross-partner identity resolution, and data monetization activities conducted jointly by Defendant and the Third Parties.

10. Through the Trackers, Defendant causes Third Parties to collect a wide range of routing, addressing, and signaling information from users' browsers and devices without users' knowledge or consent. This information includes users' explicit Internet Protocol ("IP") addresses in human readable format; browser and device type; operating system; screen dimensions; language and timezone settings; unique session-level and persistent identifiers assigned by third-party tracking systems; referrer URLs; full page URLs; timestamps; and event classifications associated with users' interactions with the Website. As configured by Defendant, this information is transmitted to third-party servers in real time as users browse vehicle listings, search inventory, view product detail pages, and interact with Defendant's online purchasing flow. Third Parties also derive users' approximate geographic location from IP-based routing information. Collectively,

this information ("User Information") is used for analytics, behavioral measurement, advertising attribution, cross-site and cross-device tracking, and participation in programmatic advertising and data-monetization workflows. Defendant knowingly exploits the User Information collected by these Trackers acting jointly with the Third Parties operating them to optimize marketing performance, retarget prospective purchasers, and monetize user interactions with the Website, thereby benefiting from the unconsented-to commercial use of Plaintiff's and Class Members' personal information.

11. Beyond the collection of non-content signaling information, Defendant and the Third Parties operating the Trackers also unlawfully intercept and disclose the contents of users' electronic communications in violation of California Penal Code § 631. As deployed on the Website, third-party tracking requests transmit human-readable communications content within request payloads, including users' IP addresses and the specific URLs corresponding to pages users view on the Website. These URLs reveal the precise subject matter of users' information-seeking activities, such as the particular vehicle listings, pricing pages, financing pages, trade-in valuation pages, or other sensitive pages users access during the car-shopping process. The Trackers transmit this URL-level content contemporaneously with each communication users attempt to send to the Website, duplicating and disclosing the contents of those communications to third-party advertising and data-analytics companies while the communications are in transit and before the requested page finishes loading. This interception and disclosure of communications content occurs without users' knowledge or consent and without any judicial authorization. By capturing and sharing human-readable IP addresses and page-level URLs that disclose the substance and context of users' private online activity, Defendant violates CIPA's prohibition on the unlawful interception and disclosure of electronic communications.

12. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other categories of User Information, they operate as "pen registers" and/or "trap and trace devices" within the meaning of Cal.

Penal Code § 638.50. These technologies silently collect routing and addressing information for commercial purposes without the user's knowledge, consent, or interaction. Courts have recognized that such conduct falls within the scope of CIPA's prohibitions. *See, e.g., Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

13.    The invasiveness of Defendant's conduct is compounded by the nature of the third parties operating the Trackers and receiving Plaintiff's and Class Members' IP addresses and associated user information. These entities operate large-scale advertising, analytics, and identity-resolution platforms that are designed to combine information collected from characteristics, and event data with information collected from users' interactions on other websites and applications. By aggregating these data sources, the Third Parties add Website users' IP addresses and Website-derived information to persistent cross-site user profiles capable of identifying or re-identifying the same individual or device across multiple browsing sessions and contexts. Those profiles are then used to track Plaintiff and Class Members across the Internet and are made available to advertisers and data partners for purposes including targeted advertising, advertising attribution, identity resolution, cross-device tracking, and audience segmentation based on a broad universe of behavioral and inferred demographic attributes.

14.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their communications, online activities, specific IP addresses, or behavioral data to be disclosed or monetized in this way. The Website did not display any consent banner, pop-up, cookie notice, or prior disclosure requesting authorization before installing pen-register or trap-and-trace technology. General statements in a privacy policy buried behind non-blocking hyperlinks do not constitute the express prior consent.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## II.    **PARTIES**

16.    Plaintiff SALEEM ERAKAT is a California citizen residing in Contra Costa County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on multiple occasions during the class period, including but not limited to on December 24, 2025.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17.    Defendant CARVANA OPERATIONS HC LLC is a Delaware limited liability company that owns, operates, and/or controls the Website, which is an online platform offering vehicle-related goods and services to consumers, including the ability to browse, finance, and purchase used vehicles through a fully digital interface.

18.    CARVANA OPERATIONS HC LLC is part of the Carvana corporate enterprise, a nationwide online automotive retailer that facilitates consumer vehicle transactions through web-based platforms. Carvana's business model centers on e-commerce vehicle sales, digital financing, trade-in services, and vehicle delivery, supported by centralized technology, logistics, and marketing operations.

19.    Carvana employs thousands of people across its technology, logistics, customer support, marketing, and operations functions. Its core business revolves around the online marketing, sale, financing, and delivery of used vehicles, with a substantial emphasis on data-driven consumer engagement, online advertising, and performance measurement across digital channels.

20.    The Website is a central component of Carvana's digital commerce ecosystem. It allows consumers to browse vehicle inventories, view detailed vehicle listings, obtain financing terms, complete purchases, schedule delivery or pickup, and manage accounts. The Website functions as the primary consumer-facing interface through which Carvana conducts its retail operations.

21.    The Website is integrated into Carvana's broader marketing, analytics, and advertising infrastructure. As users interact with the Website, Carvana employs tracking and measurement technologies to monitor page views, navigation paths, and user

1  engagement for purposes including analytics, advertising attribution, marketing

2  optimization, and customer acquisition. In addition to facilitating vehicle transactions,

3  the Website operates as a channel for collecting and leveraging user interaction data in

4  connection with Carvana's digital advertising and marketing strategies.

5  ### III.    JURISDICTION AND VENUE

6  22.    This Court has subject matter jurisdiction over this action pursuant to the

7  Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in

8  controversy exceeds $5,000,000 and there are over 100 members of the proposed class.

9  Further, at least one member of the proposed class is a citizen of a State within the United

10  States and at least one defendant is the citizen or subject of a foreign state.

11  23.    This Court has personal jurisdiction over Defendant for the reasons set forth

12  in paragraph 24 through 33 below:

13  24.    Defendant is subject to specific personal jurisdiction in California because

14  it has purposefully directed the conduct giving rise to Plaintiff's claims toward California

15  residents, and Plaintiff's claims arise directly from that California directed conduct.

16  25.    Defendant operates a consumer facing website through which it conducts

17  continuous and systematic commercial interactions with California residents. Those

18  interactions include receiving and responding to electronic communications initiated by

19  California users, processing California user requests, and collecting and using

20  information generated when California residents browse and interact with the Website.

21  Plaintiff accessed the Website from within California and engaged in ordinary browsing

22  and information seeking activity directed to Defendant's servers.

23  26.    Defendant has made an express and ongoing decision to integrate its

24  website with third party advertising, analytics, and measurement technologies operated

25  by companies with substantial operations, personnel, and infrastructure in California,

26  including Google LLC, Meta Platforms, Inc., and The Trade Desk, Inc. These companies

27  operate large scale digital advertising and analytics platforms that are designed to

28  receive, process, and monetize user level web interaction data, including routing,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

addressing, signaling, and communication content information generated when users access and navigate websites.

27.     Defendant knowingly causes California users' browsers to communicate with servers operated by these third party companies as an integral part of how the website functions. Those communications occur automatically when a California user loads pages, navigates vehicle listings, or views content on the Website. As a result, electronic communications initiated by California users are contemporaneously transmitted to third parties that maintain headquarters, offices, engineers, and network infrastructure in California, and that process user communications and identifiers in this state as part of their ordinary business operations.

28.     Defendant's own Consumer Privacy Notice confirms that it automatically collects internet and electronic network activity information, including IP address, browsing activity, pages accessed, and related usage data, and that it shares such information with advertising networks, analytics providers, and social media platforms for marketing, measurement, and targeted advertising purposes. The notice further confirms that Defendant uses cookies, tracking pixels, embedded scripts, and related tracking technologies that operate across websites and over time, and that these technologies are used to support advertising, attribution, and behavioral profiling.

29.     Defendant's privacy disclosures also confirm that it affirmatively recognizes and implements California specific privacy rights and mechanisms. Defendant publishes privacy disclosures expressly directed to California residents, provides a "Do Not Sell or Share My Personal Information" mechanism, and states that it honors opt out preference signals communicated through commonly used technical formats such as HTTP header fields or JavaScript objects at the browser level. These disclosures reflect Defendant's deliberate targeting of California users and its awareness that California residents' data is being collected, transmitted, and processed through its website and third party integrations.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

30.     The conduct giving rise to Plaintiff's claims did not occur fortuitously or as a result of passive internet activity. It arose from Defendant's intentional configuration of the Website, its selection of advertising and analytics partners with deep California operations, and its ongoing commercial exploitation of California user communications and interaction data. Defendant knew that California users would access the Website, that their electronic communications would be transmitted to third party platforms operating in and from California, and that those communications would be used for advertising, analytics, and monetization.

31.     Plaintiff's claims under California Penal Code section 631 arise from the interception and disclosure of the contents of electronic communications initiated by a California resident while communicating with the Website, including the transmission of human readable URLs and page level information revealing the substance of Plaintiff's information seeking activity.

32.     Plaintiff's claims under California Penal Code section 638.51 arise from Defendant's use of tracking technologies that function as pen registers and trap and trace processes, capturing and transmitting dialing, routing, addressing, and signaling information associated with those same California communications.

33.     Because Defendant purposefully directed its data collection, tracking, and advertising practices toward California residents, caused California users' communications to be transmitted through and processed by entities operating in California, and derived commercial benefit from those California based activities, the exercise of specific personal jurisdiction over Carvana in California is proper and consistent with due process.

34.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Plaintiff resides here with an intent to reside indefinitely; (2) Defendant regularly transacts business in this District and is subject to personal jurisdiction here; and (3) a substantial part of the events or omissions giving rise to the claims occurred within this District.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

35.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

36.    CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

37.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

38.    Conversely, a "trap and trace device" is a device or process that captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding the contents (Cal. Penal Code § 638.50(b)).

39.    In practical terms, a pen register is a device or process that records outgoing dialing information, while a trap and trace device is a device or process that records incoming dialing information.

40.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing phone numbers dialed from a specific line and trap and trace devices recording the phone numbers of incoming calls to that line.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

41.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line, essentially capturing the user's outgoing information.

42.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address and the subject line, capturing the incoming information.

43.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

44.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long

1   been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir.

2   2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).)

3       45.    Both the legislative history and statutory language indicate that the

4   California Legislature intended CIPA to protect core privacy rights. Courts have found

5   that violations of CIPA give rise to concrete injuries sufficient to confer standing under

6   Article III. (*See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet*

7   *Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).)

8       46.    Individuals may pursue legal action against violators of any CIPA

9   provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties

10  per violation (Cal. Penal Code § 637.2(a)(1)).

11  **2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

12      47.    When the Plaintiff and Class Members accessed the Website, their browsers

13  initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which

14  hosts the content and functionality of the site. In response, the server transmitted an

15  HTTP response containing the necessary resources, including HTML, cascading style

16  sheets (CSS), JavaScript files, and image assets, used by the browser to render and

17  display the webpage. These resources also included client-side scripts that initiate

18  communication with third-party services for analytics, marketing, and tracking purposes.

19  The server's instructions include how to properly display the Website, *e.g.* what images

20  to load, what text should appear, or what music should play.

21      48.    In addition, the server's instructions included client-side scripts that initiate

22  communication with third-party services for analytics, marketing, and tracking purposes.

23  The instructions cause the Trackers to be installed on a user's browser.  The Trackers

24  then cause the browser to send identifying information—including the user's IP address

25  and User Information to the Third Parties.  These Third Parties, through their Trackers,

26  also set a cookie on Website users' browsers, which sends a unique identifier to these

27  Third Parties that allows them to track users on the Website over multiple visits and

28  across the Internet.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

49.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

**Figure 1:**



50.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests,  to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

51.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

52.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers.  Nor did Defendant obtain a court order before installing or using the Trackers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

53.     An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

54.     Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.  IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

55.     Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

56.     Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider

---

[1]  *See, e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/ network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  associated with the public IP.  This geolocation capability is leveraged by online
2  advertising and user identification services.

3       57.    In contrast, private IP addresses are used within internal networks and are
4  not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA")
5  reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*,
6  172.16.0.0 through 172.31.255.255).  They are isolated from the global Internet and can
7  be reused across different networks without conflict. For example, a home network in
8  New York and an office network in Tokyo can both use the same private IP address (*e.g.*,
9  192.168.1.1) for their routers without conflict.

10       58.    The distinction between a public and private IP address is fundamental to
11  the architecture of modern networks.  Public IP addresses facilitate global
12  communication, while private IP addresses conserve the finite amount of combinations
13  to make an IP address through local network communication.   And crucially, a private
14  IP address does not divulge a user's geolocation, whereas a public IP address does and
15  is thus extensively used in advertising.

16       59.    An analogy is useful.  A public IP address is like the number for a landline
17  telephone for a household.  A private IP address is like each handset that is connected to
18  that landline number (*e.g.*, "Handset #1," "Handset #2").  Alot can be gleaned from
19  knowing the phone number who is making the call, while knowing Handset #1 versus
20  Handset #2 is making a call provides additional information.

21
22  / / /
23
24
25  / / /
26
27
28  / / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

60.    The same is true of IP addresses.  The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

61.    Thus, the differences between public and private IP addresses are as follows:[3]

/ / /

/ / /

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address.  So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

62.    A public IP address is therefore "routing, addressing, or signaling information."   A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

63.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

64.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

65.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

66.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

67.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[7]   Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

68.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10]   For example, for a job fair in specific city, companies can send advertisements to only those in the

---

[4]  Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.
[5]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.
[6]  *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.
[7]  Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.
[8]  *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.
[9]  Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.
[10]  *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    general location of the upcoming event.[11]

2    69.    "IP targeting is a highly effective digital advertising technique that allows

3    you to deliver ads to specific physical addresses based on their internet protocol (IP)

4    address. IP targeting technology works by matching physical addresses to IP addresses,

5    allowing advertisers to serve ads to specific households or businesses based on their

6    location."[12]

7    70.    "IP targeting capabilities are highly precise, with an accuracy rate of over

8    95%. This means that advertisers can deliver highly targeted ads to specific households

9    or businesses, rather than relying on more general demographics or behavioral data."[13]

10    71.    In addition to "reach[ing] their target audience with greater precision,"

11    businesses are incentivized to use a customer's public IP address because it "can be more

12    cost-effective than other forms of advertising."[14]  "By targeting specific households or

13    businesses, businesses can avoid wasting money on ads that are unlikely to be seen by

14    their target audience."[15]

15    72.    In addition, "IP address targeting can help businesses to improve their

16    overall marketing strategy."[16]  "By analyzing data on which households or businesses

17    are responding to their ads, businesses can refine their targeting strategy and improve

18    their overall marketing efforts."[17]

19    73.    The collection of IP addresses here is particularly invasive here:  As a report

20

---

21    [11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI,
https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-
22    marketing-campaigns.
[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj
23    0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV
5-5maUaAgtNEALw_wcB.
24    [13] *Id.*
[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Busines*ses, LINKEDIN (Nov.
25    29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-
willi
26    ams-z7bhf.
[15] *Id.*
27    [16] *Id.*
[17] *Id.*
28

---

20

from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

74.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

75.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

/ / /

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

76.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

77.     Often times, third-party scripts are installed on websites "for advertising purposes."[21]

78.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

79.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

80.     As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser. This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

81.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

---

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

[21] *Id.*

[22] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

82. Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

83. At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members's consent for such conduct. Nor did Defendant obtain a court order to install or use the Trackers.

**3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

84. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness. These transmissions occurred silently, automatically, and without any visual indication to Plaintiff. No disclosure, banner, or mechanism alerted Plaintiff that his device would serve as a communication channel to multiple unrelated advertising and identity-resolution vendors.

85. The third-party transmissions were triggered the moment Plaintiff's browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST requests and routing those signals to multiple advertising and identity-resolution endpoints before the requested pages finished loading or became visible on his device.

86.     The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

87.     This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

88.     When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

89.     The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

90.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

91.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

92.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**4.      *Plaintiff And Class Members' Data Has Financial Value***

93.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

94.     Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

95.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

96.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

97.     In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

98. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

99. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

100. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

## 5. *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent*

101. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

102.   Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

103.   IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

104.   When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles.

Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6.** **Defendant's Affirmative Configuration of Tracking Pixels to Transmit Human-Readable Addressing and Content Information**.

105. Defendant configured its Website so that third-party tracking pixels transmitted visitors' IP addresses and related signaling information in explicit, human-readable form, rather than limiting those third parties to passive network-level observation. Defendant's implementation caused a Trade Desk tracking request to include a labeled IP address parameter within the application-layer request URL, together with other tracking fields that identify the visitor's network connection and session. Web browsers do not automatically expose IP addresses as URL parameters or readable JavaScript values, so the presence of a labeled IP field reflects an intentional design choice by Defendant or its agents to capture the visitor's IP address and inject it into outbound pixel requests. This configuration served no technical necessity for page rendering or ordinary first-party analytics; instead, it advanced the commercial objectives of Defendant and its advertising intermediaries, which use IP addresses as high-value inputs for attribution, identity resolution, and cross-site behavioral profiling. By deliberately transmitting the visitor's IP address in this manner, Defendant enhanced third parties' ability to associate individual browsing sessions with real-world network identifiers, thereby prioritizing advertising enrichment and audience monetization over visitor privacy.

106. During the same sessions, Defendant also configured Google Analytics and Meta tracking pixels to transmit human-readable, product-level content tied to specific vehicle detail pages.

/ / /

107. Defendant's Google Analytics implementation sent full vehicle detail URLs and corresponding document titles, enabling third parties to identify the precise vehicle listing a visitor viewed, together with persistent client identifiers and device metadata that permitted correlation of that activity across sessions and devices.

108. Defendant's Meta Pixel implementation likewise transmitted full vehicle detail URLs, readable referring pages, and semantic event labels such as "ViewContent" that describe the nature of the visitor's interaction with a particular listing, allowing Meta to treat those signals as commercial intent data within its advertising ecosystem.

109. Defendant further preserved navigation context by allowing referrer information and parameter values to reveal the originating page and the visitor's path through the site, so that third parties could reconstruct how users navigated between listings and touchpoints.

110. Collectively, these configurations show that Defendant chose to convey human-readable IP addresses, specific product-level content, behavioral semantics, and navigation paths to multiple third parties during routine browsing—not as an unavoidable byproduct of Internet routing, but as the result of deliberate, avoidable design decisions adopted to maximize the marketing, profiling, and monetization value of user interactions for Defendant and its advertising partners.

## 7. *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

111. The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

112. As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

///

113.   To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

114.   In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a.  Data Brokers And Real-Time Bidding: The Information Economy
#### Data Brokers

115.   While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

116.   "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.
[30] SHERMAN, *supra*, at 2.

political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

117.   For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do. On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

118.   Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

119.   This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

120.   As another example:

---

[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.
[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.
[34] *Id.*
[35] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

…

Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

/ / /

/ / /

/ / /

---

[36] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

121.   Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

**Figure 4:**



[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

34

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

122.    As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

123.    Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

124.    These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

125.    In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

126.    These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data

---

[38] *Id.* at 11.
[39] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.
[40] Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

127.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

128.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

129.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process."  "DSPs [which is what the Trade Desk is[42]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[43]  And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[44]

130.   In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like Trade Desk help advertisers select which users to

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] HTTPS://WWW.THETRADEDESK.COM/OUR-DEMAND-SIDE-PLATFORM ("The leading demand-side platform for data-driven advertising").

[43] *Id*.

[44] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertise and target, and an Advertising Exchange is the platform on which all of this happens.

131.  The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, the Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[45]

**Figure 5:**



---

[45] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

132.   Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.   These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.   As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker].  DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[46]

**Figure 6:**



/ / /

---

[46] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

133.   In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user.  If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

134.   Likewise, a DSP like the Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

135.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

136.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

a.    "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

b.    "send[ing] sensitive data across geographic borders."

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

  c. sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad. Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[47]

137. Given The Trade Desk operates a DSP here, the last point is particularly relevant, as it means Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement. This greatly diminishes the ability of users to control their personal information.

138. Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[48]

139. For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the sheer number of entities that receive personal information[49]:

/ / /

/ / /

/ / /

---

[47] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.
[48] Geoghegan, *supra*.
[49] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 7:**



140.   All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against. *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

141.   It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).   The final question is how do these Third Parties share

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

142.  Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[50]  This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[51]

143.  Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.
>
> Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com.  Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the*
> *browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*
>
> …

/ / /

---

[50] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[51] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[52]

**Figure 8:**



144.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[53]

---

[52] Papadopoulos, *supra*, at 1433.
[53] Papadopoulos, *supra*, at 1434.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

145.   On the flip side, "CSync may re-identify web users even after they delete their cookies."[54] "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[55] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure. Consequently: (i) users are not able to abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[56]

146.   Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[57]

147.   Cookie syncing is precisely what is happening here.  When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website.  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from actually being anonymous when they visit the Website.

148.   To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same.  The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (e.g., various data brokers) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared amongst

---

[54] Id.
[55] See id.
[56] Id.
[57] Id. at 1441.

the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible. And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

149. Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

150. Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

151. Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system. In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

152. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

153. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

154.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

155.   The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

156.   The Trade Desk provides identity and audience tools that enable Defendant and its advertising partners to expand the scope of behavioral data derived from visits to the Website. By linking on-site browsing activity with pseudonymous identifiers and participating in cross-partner identifier syncing, these tools support the creation of persistent audience profiles that can extend beyond a single browser session, device, or publisher property. The Trade Desk's platform incorporates frameworks such as Unified ID 2.0, an email- or phone-based pseudonymous identifier designed to map users across participating domains and channels in a privacy-framed manner. In combination, these practices allow raw behavioral signals collected the Website to be translated into

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

monetizable, targetable audience segments that can be bought and sold across the programmatic advertising ecosystem for Defendant's campaigns.

**8.    *Defendant's Privacy Policy Misrepresentations and Unjust Enrichment***

157.    Defendant's ability to monetize Plaintiff's vehicle-shopping activity through tracking depends on users' reasonable belief that their browsing will not be secretly disclosed to third parties without notice or meaningful choice. That belief is fostered by Defendant's Consumer Privacy Notice, which represents that users retain control over their personal information and that data sharing occurs subject to user choice and lawful bases.

158.    Defendant's Consumer Privacy Notice emphasizes opt-out rights, preference management, and control over cookies, tracking technologies, and interest-based advertising, and represents that users may limit or prevent the selling, sharing, or targeted advertising use of their personal information.

159.    In practice, however, Defendant's Website transmits users' browsing data to third-party analytics and advertising companies immediately upon page load, before any opt-out mechanism can be accessed or exercised. These transmissions include full vehicle detail page URLs, descriptive page metadata, persistent identifiers, device and browser signaling information, and explicit IP addresses contained within outbound request payloads.

160.    Because these disclosures occur automatically and instantaneously, no user choice described in Defendant's Privacy Notice can prevent the initial transmission of personal data. Industry opt-outs, browser settings, and preference signals cannot retroactively undo disclosures that have already occurred.

161.    Defendant derives substantial commercial value from this undisclosed tracking. Detailed vehicle-shopping data increases the value of users within the advertising ecosystem and enhances Defendant's marketing performance, attribution, and analytics, while also providing Defendant with granular insights into consumer behavior and conversion.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

162.    Defendant could not have obtained this value through transparent means. Had Defendant disclosed that viewing specific vehicle listings would immediately result in third-party data transmission before any choice could be exercised, reasonable users would have declined to proceed or demanded compensation for the use of their data.

163.    By representing that users are in control of their personal information while simultaneously deploying tracking that executes before any control is possible, Defendant extracted valuable behavioral data without providing the promised choice or transparency.

164.    Defendant was unjustly enriched by retaining the benefits of this tracking at the expense of Plaintiff and Class Members, who suffered the loss of privacy inherent in the undisclosed disclosure of their Website activity.

165.    Plaintiff has visited the Website multiple times and intends to do so in the future for the purpose of researching vehicle prices, options and specifications.

## V.    SPECIFIC ALLEGATIONS

### 1.    *The Google Trackers*

166.    The Website embeds Google Tag Manager and Google Analytics, which automatically execute upon page load. These Google Trackers capture and transmit dialing, routing, addressing, and signaling information associated with users' electronic communications with the Website, including the specific vehicle-detail resources requested, timestamps, referrer paths, browser and device identifiers, and persistent Google-assigned identifiers. Through this operation, the Google Trackers function as pen registers and trap-and-trace devices or processes within the meaning of California Penal Code § 638.51.

167.    **Figure 9** is a Chrome DevTools Network capture showing a GET request to https://www.googletagmanager.com/gtm.js?id=GTM-…, initiated automatically on page load without any user interaction. The record reflects the destination host www.googletagmanager.com, the GET request method, and a successful 200 OK response. This capture shows that Carvana invoked Google Tag Manager as part of the

initial page rendering process, thereby loading Google's tag management framework to coordinate subsequent Google Analytics collection and dispatch of user signaling data.

**Figure 9:**



168.    **Figure 10** is a Fiddler capture of a Google Analytics collection request intercepted in real time while the communication was in transit, showing an outbound POST request from Plaintiff's browser to https://www.google-analytics.com/g/collect. The capture reflects the complete HTTP request as it left the browser, including the request headers and payload. Those fields confirm that, during Plaintiff's live interaction with the Website, the browser transmitted analytics data to Google, including referrer information, timing data, browser and device characteristics, and a persistent Google Analytics client identifier (cid). Because this request was intercepted at the moment of transmission—before delivery to Google—it evidences third-party interception and routing of Plaintiff's electronic communication in the course of transmission from the browser to Google's analytics infrastructure.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10:**



169. **Figure 11** is a Chrome DevTools Network payload capture showing that Google Analytics received the human-readable URL of a specific vehicle detail page viewed by the user. The request parameters include the dl (document location) field containing the full vehicle-specific URL, together with the dt (document title) field identifying the particular vehicle listing viewed. These values were transmitted contemporaneously with the user's navigation to that vehicle page and identify the precise resource requested by the user.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# **Figure 11:**



170.    The transmission of vehicle-specific URLs to Google constitutes the capture of addressing and routing information identifying the destination and structure of the user's communication with the Website. These URLs identify the exact vehicle-detail endpoint requested, the sequencing of page navigation, and the relationship between referring and destination resources. This information falls squarely within the scope of dialing, routing, addressing, and signaling information protected by § 638.51.

171.    The Google Trackers operate as a "process" because they are software mechanisms that identify users, assign persistent identifiers, collect signaling metadata, and correlate that data across multiple requests. They also operate as a "device" because the tracking code executes on users' computing hardware to capture and transmit signaling information. See *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

172.    By assigning and reading persistent identifiers such as Google Analytics client IDs, the Google Trackers enable Google to recognize the same browser across multiple page views and sessions. This allows Google to associate specific vehicle-view

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

requests with an identifiable browser and to link those requests over time, thereby constructing a record of the user's interactions with the Website and other Google-instrumented properties.

173.    Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process, did not obtain consent to transmit the content of Plaintiff's online communications, and did not obtain Plaintiff's consent to deploy the Google Trackers or to transmit signaling information associated with Plaintiff's vehicle-view communications to Google.

174.    Defendant's installation and operation of the Google Trackers constitutes the unauthorized use of a pen register and trap-and-trace device or process in violation of California Penal Code § 638.51 because the Trackers record and transmit dialing, routing, addressing, and signaling information associated with users' electronic communications with the Website without consent or court authorization. Defendant also intercepted and disclosed the contents of Plaintiff's electronic communications in transit in violation of California Penal Code § 631.

## 2.    *The Facebook Tracker*

175.    The Facebook Tracker, implemented through Meta's Facebook Pixel, is embedded on the Website and automatically executes upon page load. When executed, the Facebook Pixel causes the user's browser to initiate outbound communications to Meta-controlled servers, transmitting dialing, routing, addressing, and signaling information associated with the user's interaction with the Website. These transmissions occur contemporaneously with the user's navigation and without any user-initiated action, court order, or express consent.

176.    **Figure 12** is a Chrome DevTools Network capture showing a GET request to https://connect.facebook.net/en_US/fbevents.js, initiated automatically during the initial rendering of the Website. The record reflects the destination host connect.facebook.net, the GET request method, and a successful 200 OK response. This capture confirms that Defendant intentionally invoked Meta's Facebook Pixel JavaScript

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

library as part of the page load process, thereby initializing Meta's tracking framework to enable subsequent event-based data transmission from the user's browser to Meta.

**Figure 12:**



177.  **Figure 13** is a Chrome DevTools Network capture of a Facebook Tracker request to https://www.facebook.com/tr/, transmitted automatically during Plaintiff's browsing session. The query string parameters include a human-readable page location parameter, dl, containing the full URL of a specific vehicle detail page viewed by Plaintiff, together with a referring page parameter, rl, identifying the immediately preceding page. The request further includes the event parameter ev=ViewContent, along with additional content metadata fields reflecting vehicle-specific identifiers and pricing context, as well as device and session attributes such as screen dimensions. These parameters were transmitted in readable form while the communication was in transit from Plaintiff's browser to Meta's servers, revealing the exact vehicle listing Plaintiff viewed at the moment of transmission.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 13:**



178. **Figure 14** is a Fiddler capture of the same Facebook Tracker request intercepted in real time as it exited Plaintiff's browser. The capture shows the outbound request to https://www.facebook.com/tr/ with the full query string and request headers visible in plaintext, including the human-readable page location parameter identifying the vehicle detail page, the referring page value, and browser signaling headers such as User-Agent and Accept-Language. This record confirms that the Facebook Pixel transmission occurred during the live session, while Plaintiff's communication with the Website was in progress, and was observable at the network level independent of browser developer tools.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 14:**



179. Through the execution of the Facebook Tracker, Meta received routing and addressing information sufficient to identify the specific Website resource requested by Plaintiff, the sequence of navigation leading to that request, and the timing and context of the interaction. The structure of the transmitted parameters permitted Meta to determine which exact vehicle Plaintiff viewed and to associate that information with Meta-assigned persistent identifiers stored in the browser, including the _fbp cookie.

180. The Facebook Tracker is at least a "process" because it is software that identifies users, collects and correlates signaling information, and transmits that information to a third party during electronic communications. It is also at least a "device" because the tracking code executes on the user's computing hardware and causes that hardware to transmit signaling information to Meta's servers. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

181. By embedding and operating the Facebook Tracker on the Website, Defendant caused Meta to acquire Plaintiff's dialing, routing, addressing, and signaling information during transmission, including human-readable URLs identifying specific vehicle detail pages viewed by Plaintiff. These acquisitions occurred contemporaneously

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

with Plaintiff's communications with the Website and without Plaintiff's knowledge or consent.

182.    Defendant did not obtain a court order authorizing the use of any pen register or trap-and-trace device or process, and Plaintiff did not consent to the interception or acquisition of his communications or signaling information by Meta. Defendant's installation and operation of the Facebook Tracker therefore constitutes an unlawful interception and acquisition of communications and signaling information in violation of California Penal Code §§ 631 and 638.51.

### 3.    The Impact Tracker

183.    The Impact Tracker is embedded on the Website and executes automatically when a user accesses the Website. Defendant installed Impact's JavaScript tracking code on the Website, which causes the user's browser to load Impact-controlled resources during page rendering. This execution occurs without any user interaction and initiates outbound network requests from the user's browser to Impact-controlled servers as part of Defendant's affiliate marketing and attribution infrastructure.

184.    **Figure 15** is a Chrome DevTools Network capture showing a GET request to a JavaScript resource hosted at https://d.impactradius-event.com/[UUID].js, initiated automatically during page load. The record reflects the destination host, the GET request method, and a successful response, confirming that Defendant caused the browser to retrieve Impact's tracking script as part of the initial page rendering process. This establishes that Defendant affirmatively integrated Impact's tracking framework into the Website and triggered third-party network activity upon user access.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 15:**



185. **Figure 16** is a Fiddler capture of the same Impact JavaScript request intercepted in real time via the outbound network stream. The capture shows the browser transmitting request headers to Impact-controlled infrastructure, including the User-Agent string, language preferences, and the referring Carvana page. This confirms that the Impact Tracker operates by causing the browser to initiate live outbound requests to a third party during the user's session, transmitting routing, addressing, and signaling information associated with the user's interaction with the Website.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1

**Figure 16:**



186. **Figure 17** is a Wireshark DNS capture showing the browser resolving d.impactradius-event.com to external IP addresses during the session. This network-layer evidence confirms that the browser established live routes to Impact-controlled infrastructure in order to deliver the tracking request initiated by Defendant's Website code. The DNS resolution occurred contemporaneously with the user's visit and as a necessary precursor to the outbound request shown in Figures 15 and 16.

/ / /

/ / /

/ / /

58

**Figure 17:**



187.    Defendant caused the Impact Tracker to function as a third-party tracking process that captures and transmits non-content dialing, routing, addressing, and signaling information associated with users' interactions with the Website, including browser characteristics, request timing, and referral context. This information identifies the source, destination, and circumstances of the user's interaction with the Website and is transmitted to Impact in real time as part of Defendant's commercial tracking operations.

188.    Defendant never obtained a court order authorizing the use of any device or process to intercept or transmit user information through the Impact Tracker, and Plaintiff never consented to Defendant's installation or operation of Impact's tracking technology on his browser.

189.    Plaintiff never consented, and Defendant never obtained a court order, authorizing the real-time interception or transmission to third parties of the contents of Plaintiff's electronic communications with the Website, including the human-readable URLs identifying the specific vehicle detail pages Plaintiff viewed. Those URLs reflect the substance of Plaintiff's information-seeking activity and were transmitted

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

contemporaneously, in transit, to third-party servers as Plaintiff navigated the Website. Defendant caused those disclosures to occur automatically, without notice and without any opportunity for Plaintiff to meaningfully prevent or control the transmission, in violation of California Penal Code § 631.

### 4.    *The Trade Desk Tracker*

190.    The Trade Desk Tracker is embedded on the Website and executes automatically during a user's visit. Defendant installed tracking code that causes the user's browser to initiate outbound requests to Trade Desk-controlled infrastructure at trkn.us as part of advertising attribution and real-time bidding operations. These requests are triggered during page interaction without any affirmative user action.

191.    **Figure 18** is a Fiddler capture of an outbound GET request to https://trkn.us/pixel/conv/ intercepted in real time during Plaintiff's session. The query string contains an explicit application-layer parameter ip=68.197.9.83, embedded directly in the request URL, along with campaign and conversion identifiers. The request headers also include the full User-Agent string and a Referer identifying the originating Carvana page. This capture shows that Defendant caused Plaintiff's human-readable IP address to be transmitted directly to The Trade Desk while Plaintiff was actively using the Website.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 18:**



192. **Figure 19** is a Chrome DevTools Network capture showing the same trkn.us pixel request initiated by the browser during live interaction with the Website. The request URL again contains the ip= parameter, along with screen dimensions, browser signaling headers, and mobile device characteristics. This capture confirms, at the browser level, that Plaintiff's IP address and associated signaling information were transmitted to The Trade Desk contemporaneously with Plaintiff's navigation of the Website.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 19:**



193.    **Figure 20** is a Wireshark DNS capture showing resolution of the trkn.us domain to external IP addresses during Plaintiff's session. This DNS activity confirms that the browser established active network routes to Trade Desk-controlled infrastructure as part of delivering the outbound tracking requests shown in Figures 18 and 19. The resolution occurred during Plaintiff's session and immediately preceded transmission of the request containing Plaintiff's IP address.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 20:**



194.   Through this configuration, Defendant caused the Trade Desk Tracker to operate as a third-party tracking process that captures and transmits non-content dialing, routing, addressing, and signaling information, including Plaintiff's IP address, browser and device characteristics, referral context, and timing metadata. The explicit inclusion of the IP address in the request URL identifies the source of the interaction and enables persistent user and household-level identification within The Trade Desk's advertising and bidding infrastructure.

195.   In connection with these transmissions, Trade Desk infrastructure assigns and maintains persistent identifiers associated with the user's browser. The Trade Desk responds to the tracking request by setting a unique identifier cookie scoped to the trkn.us domain, allowing subsequent recognition of the same browser across interactions and supporting cross-site advertising attribution.

196.   Defendant never obtained a court order authorizing the installation or use of any pen register or trap-and-trace device or process to capture or transmit Plaintiff's IP address or related signaling information through the Trade Desk Tracker, and Plaintiff

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

never consented to Defendant's deployment or operation of this tracking technology on his browser.

197.   Plaintiff also never consented, and Defendant never obtained a court order, authorizing the real-time interception or transmission, in transit, of the contents of Plaintiff's electronic communications to third parties insofar as Defendant caused human-readable addressing information associated with Plaintiff's Website interactions to be transmitted contemporaneously to The Trade Desk during Plaintiff's session, in violation of California Penal Code § 631.

## VI.      CLASS ALLEGATIONS

198.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

199.   **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

200.   **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;

- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether Defendant caused Plaintiff's and Class Members' communications with the Website to be duplicated and transmitted to third parties in real time;

- Whether Plaintiff and Class Members are subject to same tracking policies and practices;

- Whether Defendant violated CIPA;

- Whether Plaintiff and Class Members are entitled to statutory damages;

- Whether Class Members are entitled to injunctive relief;

- Whether Class Members are entitled to disgorgement of data unlawfully obtained;

- Whether the Defendant's conduct violates the California Constitution;

- Whether the Defendant's conduct constitutes an intrusion upon seclusion;

- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice; and

- Whether Plaintiff and the Class Members are entitled to equitable relief for unjust enrichment.

201. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

202. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

203. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in

1    which individual litigation of numerous cases would proceed. Individualized litigation
2    also presents a potential for inconsistent or contradictory judgments.

### VII.    <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

204.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

205.    Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

206.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

207.    The Trackers recorded Plaintiff and Class Members' dialing, routing, addressing, and signaling information in real time, automatically transmitting this dialing, routing, addressing and signaling data to multiple third-party ad-tech endpoints before the Webpage fully loaded.

208.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

### VIII.    <u>SECOND CAUSE OF ACTION</u>

### Violations of Cal. Constitution Article I § 1

### *By Plaintiff and the Class Members Against All Defendants*

209.    Plaintiff reasserts and incorporates by reference the allegations set forth in

each preceding paragraph as though fully set forth herein.

210.   Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

211.   Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a private right of action against both governmental and private actors who engage in conduct that constitutes a serious invasion of privacy.

212.   Plaintiff and the Class Members possess a legally protected privacy interest in the confidentiality of their online behavior, communications metadata, and identifying information, including but not limited to: IP address, browser details, session identifiers, page visit patterns, and clickstream behavior.

213.   Plaintiff and the Class Members had a reasonable expectation that their activity on Defendant's website, including what pages were visited, what content was interacted with, and when, would not be secretly tracked and transmitted to third parties via embedded surveillance code.

214.   Without Plaintiff's or the Class Members' knowledge or consent, Defendant caused the Trackers to be deployed on the Website.  The Trackers secretly transmitted Plaintiff's digital signaling data, addressing information (e.g., URLs accessed), and routing metadata (e.g., timestamps and referral paths) to the Third Parties, enabling behavioral profiling and cross-site identification.

215.   Defendant's conduct constitutes a serious and egregious invasion of Plaintiff's and the Class Members' informational privacy, far exceeding any routine or incidental data handling. The deployment of real-time surveillance tools designed to accomplish identity resolution and behavioral mapping is highly offensive to a reasonable person.

216.   Defendant lacked any legitimate justification for failing to disclose or obtain consent for this data interception and transfer. The magnitude of the privacy intrusion outweighed any speculative or commercial benefit to Defendant.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

217. As a direct and proximate result of Defendant's actions, Plaintiff and the Class Members have suffered a loss of control over personal data, emotional distress, and a violation of their constitutional right to privacy.

## IX.    THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

218. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

219. Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

220. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

221. Defendant has engaged in unlawful business practices by:

(a) Violating Article I, Section 1 of the California Constitution, which protects individuals from serious invasions of privacy; and

(b) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking.

222. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

223. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

224.    Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

225.    As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data, used for targeted advertising, behavioral modeling, and enrichment by third parties, constitutes digital property with measurable economic value.

226.    Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

# X.    <u>FOURTH CAUSE OF ACTION</u>

## Intrusion Upon Seclusion

### *By Plaintiff and the Class Members Against All Defendants*

227.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

228.    Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for intrusion upon seclusion, a well-established common law tort recognized in California, which protects individuals from

intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

229.   At all relevant times, Plaintiff and the Class Members had a reasonable expectation of privacy in their online browsing activity, including their interactions with the Website, the specific content viewed, and the behavioral signals generated through use of the website, such as page views, click paths, session timestamps, and form entries.

230.   Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. This tool was engineered to surreptitiously capture and transmit granular behavioral data, including addressing, signaling, and routing information such as IP addresses, URL paths, referrers, device attributes, and mouse activity, to third parties.

231.   The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

232.   Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous disclosure of this surveillance, nor did it obtain affirmative consent from Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

233.   The nature of this covert surveillance, especially its capacity to link online activity to identifiable users, would be highly offensive to a reasonable person, particularly in light of growing public sensitivity to privacy rights and digital surveillance.

234.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered an invasion of privacy, loss of control over personal information, and emotional harm, including anxiety, indignity, and concern over being unknowingly tracked, profiled, and exposed to targeted advertising based on private digital conduct.

235.    Defendant's conduct was willful, malicious, and oppressive, thereby justifying the imposition of punitive and exemplary damages.

## XI.    FIFTH CAUSE OF ACTION

### Unjust Enrichment

### *By Plaintiff and the Class Members Against All Defendants*

236.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

237.    Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for unjust enrichment, asserting that Defendant has been unjustly enriched through the unauthorized and uncompensated acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

238.    Plaintiff and the Class Members, while visiting and interacting with the Website, unknowingly conferred a substantial benefit on Defendant by generating digital behavioral data, including but not limited to IP address, device information, browser metadata, URL paths, session timestamps, and interaction signals.

239.    Defendant deployed the Trackers without Plaintiff's and Class Members' knowledge or meaningful consent. The data collected was then used by Defendant and/or third parties to conduct behavioral targeting, analytics, and advertising optimization that generated substantial financial value.

240.    At no time did Plaintiff and Class Members consent to the commercial exploitation of this data. Nor was Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment conferred upon Defendant.

241.    Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed, and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

asset without disclosure or fair exchange renders its conduct unjust.

242. Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA, the California Constitution, and Business & Professions Code § 17200;

3. An order declaring that Defendant's conduct unlawfully intrudes upon the seclusion of Plaintiff and the Class Members;

4. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

5. An order enjoining Defendant's conduct as alleged herein;

6. Disgorgement of profits resulting from unjust enrichment;

7. Statutory damages pursuant to CIPA;

8. Prejudgment interest;

9. Reasonable attorney's fees and costs; and

10. All other relief that would be just and proper as a matter of law or equity.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   January 9, 2026          **NATHAN & ASSOCIATES, APC**


By: *   /s/ Reuben D. Nathan*          
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com


**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED